WEBB, JUDGE:
Claimant brought this action for damaes sustained to his real property and to his family residence due to the alleged negligent maintenance of the drainage system along County Route 31, locally known as Poca River Road, in Poca. County Route 31, at this location, is maintained by respondent in Putnam County. The Court is of the opinion to deny this claim for the reasons more fully set forth below.
*284 On May 5, 1993, claimant purchased eight acres of real property with a residence built thereon in Poca, Putnam County, for the amount of $65,000.00.[1] The property was appraised for $68,000.00. The prior landowner had informed claimant that a landslide had occurred on the property in 1977, and that he had made repairs to the best of his ability.[2] Thereafter, claimant purchased the property, although he did not have the property inspected independently. An insurance agent inspected the property for insurance purposes at the time of purchase. The agent testified that she could not recall whether any repairs were necessary, but added that a homeowner’s insurance policy would not have been issued if serious repairs to the residence were necessary. Claimant and his family moved onto the property during the fourth of July weekend in 1993.
At the location in question, there is a seventy foot difference in elevation from County Route 31 sloping downhill, in a northeastern direction, to the Pocatalico River. The distance of this slope between the road and the river is about six-hundred to six-hundred-fifty feet. The southwestern side of County Route 31 is a vast mountainous hillside. Claimant’s residence is situated two-hundred-fifty feet uphill from the Pocatalico River. There is a driveway four-hundred to four-hundred-fifty feet long and nine feet wide, which traverses from the road to the residence. A septic tank is located on the property between the river and the residence. On the upper hillside, about three-hundred to four-hundred feet from the residence, a bam also is *285 situated on the property. Approximately seven-hundred feet of claimant’s property fronts County Route 31, which is a sixteen foot wide medium priority road.
Claimant’s problems on his property began on December 24, 1993, when a water line about eight-hundred feet from the residence, pulled apart nine inches. This was repaired by claimant soon thereafter. Then, on the morning of March 15, 1994, Claimant’s wife noticed that the basement wall was bowing and she could not enter the downstairs bathroom. Claimant determined that the residence had shifted nine inches. He and his family were forced to leave their home within two days because the foundation of the house shifted. The driveway had developed cracks and separations which made it unsafe for ingress and egress to the house. Claimant inspected the property and discovered that earth movement was putting pressure on the residence. He tried to remove this pressure, but he was not successful in his efforts. Not all of Claimant’s eight acres were damaged.
In the fall 1996, claimant’s residence was destroyed by a fire that was determined to be arson. The perpetrator of the crime was not apprehended. Although the residence was insured for the amount of $75,000.00, claimant and his insurance carrier became involved in a dispute over payment of his claim. Ultimately, the claim was settled for $30,000.00. The land itself was not insured. In the present claim, claimant did not assert a determined amount of damages, which, in the opinion of the Court, is limited to the value of the land.
Claimant was aware that after a major slide had occurred on County Route 31 in 1977, respondent built a three-hundred foot retaining wall with an eighteen inch culvert beneath the road surface. This culvert extends approximately three feet past the retaining wall with the outlet end discharging any water from the culvert onto Claimant’s property. The water flows downhill from the southwestern side of County Route 31 across his property to the river which is approximately six-hundred feet from the road. Claimant asserts that respondent has done nothing further to control this water during his time of occupancy at the site. He estimates the water flow from the culvert at one gallon every two minutes. According to Claimant, the major source of the slide problems occurring on his property is this particular culvert that discharges water onto his property.
According to claimant’s expert in landslides and culvert construction, Alexander Brast Thomas, the culvert beneath County Route 31 described herein above is the proximate cause of the damage to claimant’s property. According to Mr. Thomas, respondent did not provide a path for the water discharging from the culvert to the river. Thus water discharges from the culvert at the base of the wall, allowing water to be absorbed into the subsurface of the ground, weakening the soil, and causing slip conditions. Mr. Thomas opined that the culvert is the primary source of water and there is no outfall protection or any other structure to convey water t oward t he r iver. W hile M r. T homas did n ot o bserve a ny o ther s ource o f water, he did not examine the subsurface of the ground to ascertain its present *286 condition for suitable construction of a residence. Similarly, Mr. Thomas asserts that topographical maps indicate that this area is a landslide prone area. This fact provides a “caution” to a contractor, but the land can still be used for construction purposes.
Mr. Thomas believes that the culvert pipe had been moved down river after the 1977 landslide.[3] He suspects that the prior culvert pipe through the road was located above the residence before the 1977 landslide, but that it was replaced and relocated to its present location afterwards. However, Mr. Thomas could not specifically locate the prior culvert pipe. He thought that there had been a cross drain through the road at the head of the first slide. Unfortunately, the survey notes from the survey conducted by respondent’s district employees of the area in question end at the side of the residence. In the area beyond the residence, Mr. Thomas believes that there was a problem in this area in the past and respondent conducted some kind of repair project.
Furthermore, Mr. Thomas testified that he was not surprised that the landslide resumed its activity since 1977. He theorized that the 1994 slide was preventable, but after respondent constructed a stable retaining wall, it left a disaster zone between the retaining wall and the river. Mr. Thomas is of the opinion that the Martin property currently is unstable and useless for any residential purpose. Mr. Thomas further testified that in order to adequately rebuild the land, it would require about one-half million dollars of construction work.
The position of respondent is that it was not negligent in the maintenance of the drainage system on County Route 31. Both Andrew Morgan Allen, then Maintenance Assistant for respondent in Putnam County and respondent’s Operations Assistant Laura Ann Conley-Rinehart testified that the area in question is prone to landslides. Ms. Conley-Rinehart testified that the position of respondent is that if a landowner builds in an area prone to landslides, then the landowner is responsible for the drainage because respondent is an intermediate property owner. She admitted that respondent directs water through its culvert onto claimant's property in order for the water to flow to the lowest point. She stated that this is a common practice by respondent. She contends that the property owner is responsible for the water once it flows from respondent’s property.
Ms. Conley-Rinehart also testified that she and then Area Maintenance Manager, Dennis Charles Runyon, visited the site in April, 1994, in response to a complaint from Claimant. Both individuals testified that they observed the driveway in a state of disrepair, which Ms. Conley-Rinehart believes is indicative of a *287 continuing a ctive 1 andslide. M r. R unyon t estified t hat h e o bserved t he de ck a nd chimney had pulled away from the residence. Additionally, Ms. Conley-Rinehart as well as Mr. Runyon testified that they observed what they thought to be spring water flowing across from Claimant’s property on the south side of County Route 31. After the April, 1994, inspection, both Ms. Conley-Rinehart and Mr. Runyon assert that they did not notice any movement from the road or wall and could not identify anything that the State had done to create a problem. Thereafter, Ms. Conley-Rinehart relayed the findings of the onsite inspection to the office of the Highways Commissioner. The claimant previously had written to the Commissioner, the Governor, one of our U.S. Senators, and his Congressman about his problem and said findings were incorporated into letters from the Commissioner to the Senator and Congressman.
Mr. Allen stated that he was unaware of the natural drainage area of the water from the culvert, but he assumed it went to the river. Between March 15, 1994, and November 1999, respondent’s employees only conducted repaving and reditching projects in the area for the control of surface water. Respondent did not conduct any activities with regard to the control of soil movement in the area in question.
Dr. George Alan Hall, respondent’s expert in geotechnical engineering inspected the Martin property on two separate occasions after the 1994 slide. According toa W est Vir ginia Ge ological a nd Economic S urvey m ap, C laimant’s property is located in an active landslide area. Thus, when the residence was built in 1974, he is of the opinion that it was built in the middle of the active slide. The previous landowner (Westfall) or his contractor had excavated soil from the toe of the slope during construction of the residence thus reducing the stability of the slope. The piling project and retaining wall completed by respondent after the 1977 landslide had alleviated the slip effects upon the road, but not upon the land below the retaining wall. Dr. Hall determined that the slide is actually occurring some twenty-five feet downhill from the road near a scarp on Claimant’s property,. He observed a topographic condition that he described as “bulging or protruding contours.” This condition indicates that the river has been protruded, but that the natural drainage channel has cut through this protrusion. All of these facts indicate an ancient landslide which extends from the hillside above the road all the way to the river itself.
Further, Dr. Hall opined that during construction of the residence, the distinct natural drainage channel had been diverted from its natural path. The survey results, which were incorporated into a topographical map, depicted the actual drainage channel from the culvert pipe under County Route 31. Water had flowed in the natural drainage channel until changed by the prior landowner’s excavation. Dr. Hall asserts that the topographical information contained in Commissioner’s letters mentioned above support the original design of a culvert. The culvert collects the *288 water a nd dir ects it t oward t he n atural dr ainage c haraiel. No tm uch w ater flows through the culvert pipe, neither is there a lot of soft ground near the outlet of the culvert pipe. The water flows through the culvert pipe in a defined channel at a high velocity, causing less water to touch and saturate the soil. Dr. Hall stated that less water infiltration occurs when w ater flows in a concentrated path down a natural drainage channel. If there were no culvert pipe, the water flow would spread over the ground and saturate the soil.
Moreover, Dr. Hall testified that the culvert is not the primary or only source of water. Ground water has contributed to the condition of claimant’s property. Several natural springs located on Claimant’s property saturate the soil. According to Dr. Hall, Mr. Thomas’ testimony did not depict water flowing from holes in the ground, which were created by natural springs. However, these holes were not depicted in respondent’s district survey. In addition, during March of 1994 the vicinity experienced almost twenty inches of rainfall, which was the wettest period on record since 1939. The culprit, according to Dr. Hall, is the water collecting in the hillside and released in the natural springs. These natural springs create a “seepage force,” which drags the soil along with it. Dr. Hall surmised that the area could be repaired for approximately ten to fifteen thousand dollars.
The Court has held that respondent has a duty to provide adequate drainage of surface water, and drainage devices must be maintained in a reasonable state of repair. Haught vs. Dept. of Highways, 13 Ct. Cl. 237 (1980). In claims of this nature, the Court will examine whether respondent negligently failed to protect a claimant’s property from foreseeable damage. Rogers vs. Div. of Highways, 21 Ct. Cl. 97 (1996).
In the instant claim, Claimant has failed to establish that respondent maintained the drainage system on County Route 31 in a negligent manner. The Court is o f t he o pinion t hat r espondent t ook immediate a nd r easonable a ction t o repair the road after the 1977 landslide, which prevented further damage to claimant's property. The terrain in this area is typical of many areas in West Virginia which are subject to landslides. While the Court is sympathetic to the situation of claimant, the fact remains that there are many factors which have brought about this particular landslide problem affecting claimant’s property, including the prior landowner’s construction in a landslide prone area, interfering with the natural drainage area for the culvert, as well as the natural springs located on the property. Before purchasing the property, Claimant alleges that he had a conversation regarding the property on April 27, 1993, with Andrew Morgan Allen, the then Maintenance Assistant for respondent in Putnam County mentioned herein above. According to claimant, Mr. Allen never discouraged him from purchasing the property or indicated that the property was located in an area prone to landslides. Mr. Allen disputes this assertion. In fact, he testified that he told claimant not to buy the property because he personally believed that it was falling into the river. *289 According to Mr. Allen, Claimant indicated that he would not buy the property. Regardless o f a ny conversation w ith r espondent’s e mployees, c laimant w as g iven actual notice of the condition of the land by the prior landowner, O. L. “Pete” Westfall. The Court is of the opinion that any conversation between claimant and a State employee is irrelevant. If a State employee makes a statement about property to a prospective owner, the statement would normally be outside the scope of the employee’s employment with the State. Accordingly, the particular employee’s action and/or statement as testified to by Claimant, even assuming its accuracy, would have been beyond the actual or implied scope of the Mr. Allen’s authority. The Court is of the further opinion that Claimant failed to exercise reasonable care by not having the property independently inspected after receiving notice prior to the date of purchase. Consequently, there is no evidence of negligence on the part of respondent upon which to base an award.[4]
In consideration of all of the above, the Court is of the opinion to and does hereby deny this claim.
Claim disallowed.

 This property was the subject of a prior claim by the prior landowners, O.L. “Pete” Westfall and Rebecca Westfall. See Westfall vs. Dept. of Highways, 16 Ct. Cl. 23 (1985). In that claim, the Court made an award of $42,500.00 for respondent’s negligent maintenance of the ditchline on County Route 31, which caused a landslide.

 In three specific instances during Claimant’s testimony, he stated that:
“Pete Westfall told me about the slip in the ‘70s and about the state rebuilding their portion of their area and he had fixed his property to the best of his ability to where it was at when I purchased the property” (Vol. 1, Pg. 64, lines 18-22)
* * *
“There was only one agreement. He (Pete Westfall) agreed, in the agreement it states that he had told me of the previous slip 15 years approximately and that he had repaired the home to the best of his ability and he was not going to warrant or guarantee the -(property)” (Vol. 1, Pg. 79, lines 9-13)
“To the best of my knowledge, Mr. Westfall informed me that the slip had happened in 1977 and the retaining wall, it took out the road by what he’s telling me, and they installed the retaining wall I’m saying right after the slide number one.” (Vol. 1, Pg. 84, lines 19-22 and Pg. 85, Line 1).

 However, testimony from the hearing in Westfall indicates that there was no retaining wall prior to the 1977 slide and it would appear to the Court that the retaining wall in question was the only wall located on the property.

 Furthermore, claimant’s final argument brief cites caselaw that concerns initiating condemnation proceedings. If the argument in claimant’s brief is to be believed, then this Court would have no jurisdiction over this claim.